**In re Charles and Sylvia EVANS, Debtors.**

**Bankruptcy No. 94–50037M.**

United States Bankruptcy Court,
E.D. Arkansas,
Pine Bluff Division.

Aug. 25, 1995.

Walter M. Dickinson, Trustee, Little Rock, AR.

Frederick S. Wetzell, III, Little Rock, AR, for the Trustee.

Joseph A. Strode, Little Rock, AR, for Worthen National Bank of Pine Bluff.

Charles E. Clawson, Jr., Conway, AR, for Debtors.

## ORDER

JAMES G. MIXON, Chief Judge.

On January 21, 1994, Charles and Sylvia Evans (debtors) filed a voluntary petition for relief under the provisions of chapter 7 of the United States Bankruptcy Code. Walter M. Dickinson, Esq., was appointed trustee. The debtors claimed certain real property as an exempt rural homestead pursuant to 11 U.S.C. § 522(b)(2) (1988), Ark.Code Ann. § 16–66–218 (Michie Supp.1993), and Ark. Const. art. 9, § 4.

On March 8, 1994, the trustee filed an objection to the debtors' claim of homestead

exemption alleging that the property does not qualify for a rural homestead exemption but rather the exemption should be limited to an urban homestead.

On April 15, 1994, Worthen National Bank of Pine Bluff (Worthen) filed an objection to the debtors' claim of homestead exemption alleging that the property does not qualify for a rural homestead but should be limited to an urban homestead exemption.

On February 27, 1995, a hearing was held on the trustee's and Worthen's objections to exemptions and the matter was taken under advisement. The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) (1988), and the Court has jurisdiction to enter a final judgment in the case.

## BACKGROUND

The debtors claimed the following real property as an exempt rural homestead pursuant to 11 U.S.C. § 522(b)(2) (1988), Ark. Code Ann. § 16–66–218 (Michie Supp.1993), and Ark. Const. art. 9, § 4:

Commencing at the North corner of Section 24, Township 6 South, Range 9 West in Jefferson County, Arkansas; thence 28 minutes West 383.8 feet; thence South 31 degrees 50 minutes East 340.35 feet; thence South 40 degrees East 260 feet; thence South 48 degrees 12 minutes East 320 feet to a point of beginning, said point being on the West R–O–W of County Rd. # 51 (Grider Field–Ladd Rd.); thence South 44 degrees 17 minutes West 770 feet; thence South 47 degrees 12 minutes East 160 feet; thence North 44 degrees 17 minutes East 770 feet; thence 47 degrees 12 minutes West 160 feet to the point of beginning, and containing 2.8 acres more or less.

The debtors' residence is located on the east end of the property and on the west end of the property are located metal buildings that were used in the business of manufacturing new buses and rebuilding used buses.

Both the trustee and Worthen object to the debtors' claim of a rural homestead exemption alleging that the homestead should be limited to an urban homestead because the property is located in an area which is essentially urban. Both objecting parties also argue that the debtors' use of the property is more consistent with an urban rather than a rural homestead. Worthen also alleges that by designating the west part of the property to be used for business purposes, the debtors have segregated that portion of the property from their homestead and are no longer entitled to claim that portion of the property as a homestead.

The parties have submitted stipulations in which they have agreed to the relevant facts regarding the property. The property consists of a 2.8 acre tract of land located on Grider Field Ladd Road in Jefferson County, Arkansas. The debtors purchased the property in 1981 and first used it as a single family residence. A modular home was placed on the property and a fence and driveway were added.

The debtors operated a business on Main Street, Pine Bluff, Arkansas, known as Evans Motor Company. In 1980, Arkansas Bus Exchange, Inc., a closely-held corporation, (Arkansas Bus) was incorporated and began operations with Evans Motor Company on Main Street. Arkansas Bus was in the business of building new buses and rebuilding used buses. A personal shop was built on the property for use by Mr. Evans in connection with the Arkansas Bus business. The debtors eventually sold the property on Main Street and moved their business to the subject property. The debtors built a paint booth shop and added other shops to the personal shop already on the property to make one large shop, later known as Arkansas Bus. Arkansas Bus operated its business on the property until January 1994.

The debtors' residence is located on the east end of the debtors' property and has an appraised value of $64,000.00. The metal buildings located on the west end of the property have an appraised value of $200,000.00. The debtors arranged for Arkansas Bus to lease the metal buildings from them for $2,500.00 per month. The metal buildings are located about 300 feet from the debtors' residence. The stipulations regarding the metal buildings conflict with other evidence. Paragraph 8 of the stipulations

states that the metal buildings were built by Arkansas Bus with proceeds from the operation of the business. Paragraph 8 also states that Arkansas Bus and its subsidiaries claimed depreciation for the buildings on their consolidated tax returns. Contrary to these statements, paragraph 46 of the stipulations states:

[I]f the Debtors were called to testify at trial their testimony would be: "The improvements on the property were built with the Debtors' funds from Evans Motor Company and from the sale of the Main Street property. $100,000.00 of which was placed in a certificate of deposit and withdrawn as needed." Furthermore, $14,000.00 inherited from Ms. Evans' mother's estate and some funds obtained through Arkansas Bus Exchange as shown as an officer's draw were used to build the improvements on the property.

The stipulations also state that if the debtors were to testify at trial they would testify that Arkansas Bus leased the property on the west end from the debtors and made lease payments to the debtors. The debtors would also testify that Arkansas Bus did not build any improvements, but the improvements were made using proceeds from the debtors' draw accounts.

According to the stipulations, the utility services for the residence and the metal buildings are measured by the same meter. The corporation has paid all utility costs, including the utility charges incurred in connection with the debtors' residence. The parties also stipulated that the debtors have transferred no interest in the property to Arkansas Bus, other than a leasehold interest, and that the property is assessed in the name of the debtors.

The land on which the debtors' residence and the metal buildings are located has an appraised value of $86,000.00. The property claimed as exempt is not used for any agricultural purposes by the debtors. Aerial photographs attached as exhibits to the stipulations reflect that a substantial amount of the land immediately adjacent to the debtors' property is still devoted to agricultural uses. However, several other business enterprises are located within one mile of the debtors'

property, including American Freightways, Cook Crane, Key Company, Central Tin Shop, and Bayou Metal Buildings. Most of the residences located near the debtors' property are occupied by people who also operate businesses on their property.

The debtors' property is located six to eight feet from the Pine Bluff, Arkansas, city limits. Grider Field Ladd Road is a paved county road maintained by Jefferson County, Arkansas. The area is served by a fully developed system of roads and highways. The property is located two-tenths of a mile from U.S. Highway 65 and approximately one mile from Pines Mall in Pine Bluff, Arkansas, which is the largest shopping mall in southeast Arkansas. Retail services such as gas stations, convenience stores, and a grocery store, are located on U.S. Highway 65 in the vicinity of Pines Mall. Banking services are available on U.S. Highway 65B in the vicinity of the Pines Mall. The property is also located approximately one mile from Grider Field, the municipal airport for Pine Bluff, Arkansas, which is the largest airport in southeast Arkansas.

Fire protection is provided by the Southeast Fire Department, a volunteer fire department. Police protection is provided by the Jefferson County Sheriff's office. The property has a septic tank. Water is supplied to the property by the Ladd Water Association, a small community located south of Pine Bluff that maintains a municipal waterworks that expanded to include the debtors' property. City water is available at the road adjoining the property, if the debtor so elects. Electricity is supplied by Arkansas Power and Light Company, which supplies electricity to the residents of Pine Bluff, Arkansas. Telephone service is provided by Southwestern Bell Telephone Company, which provides service to the residents of Pine Bluff, Arkansas. The debtors have curbside garbage pickup provided by Waste Management, Inc., the company serving the residents of Pine Bluff, Arkansas. Emergency services, including fire, police, and ambulance services, are provided to the property through the 911 Emergency Services System in Pine Bluff, Arkansas.

## DISCUSSION

Ark.Code Ann. § 16–66–218(b) (Michie Supp.1993) provides that the following property shall be exempt from execution:

(3) Rural homesteads not exceeding one hundred sixty (160) acres of land with improvements thereon, up to two thousand five hundred dollars ($2,500) in value but in no event less than eighty (80) acres without regard to value—Arkansas Constitution, Article 9, § 4;

(4) The urban homestead not exceeding one (1) acre of land with improvements thereon, but no to exceed two thousand five hundred dollars ($2,500) in value, but in no event to be less than one-quarter (¼) of an acre of land without regard to value—Arkansas Constitution, Article 9, § 5[.]

Ark.Code Ann. § 16–66–218(b) (Michie Supp. 1993).

▇ The Arkansas Supreme Court has stated that "[i]t is the settled policy of this court that our homestead laws are remedial and should be liberally construed to effectuate the beneficent purposes for which they are intended." *Smith v. Flash T.V. Sales & Serv., Inc.*, 17 Ark.App. 185, 190, 706 S.W.2d 184, 187 (1986); *Franklin Fire Ins. Co. v. Butts*, 184 Ark. 263, 270, 42 S.W.2d 559, 562–63 (1931). The party objecting to the claim of exemption has the burden of proving that the exemptions are not properly claimed. Fed.R.Bankr.P. 4003(c).

### A. The Debtors' Use of a Portion of the Property for Manufacturing New Buses and Rebuilding Used Buses

▇ Worthen argues that the debtors have segregated a portion of their homestead and dedicated a portion of the property to business purposes and, therefore, have voluntarily reduced the size of their homestead by abandoning a portion for commercial purposes. The debtors argue that under Arkansas law the homestead protection is not lost by using a portion of the property for business purposes and cite *Bank of Sun Prairie v. Hovig*, 218 F.Supp. 769 (W.D.Ark.1963); *Jordan v. Jordan*, 217 Ark. 30, 228 S.W.2d 636 (1950); *Berry v. Meir*, 70 Ark. 129, 66 S.W. 439 (1902); and *Gainus v. Cannon*, 42 Ark. 503 (1884) in support of their argument.

▇ It is well-settled law that a "[o]ne does not lose his homestead by using part of it for business purposes." *Starr v. City Nat'l Bank*, 159 Ark. 409, 413, 252 S.W. 356, 357 (1923); *King v. Sweatt*, 115 F.Supp. 215, 219 (1953). It is also well-settled law that a party can abandon a portion of his homestead by devoting a portion of his homestead to business purposes. *Vestal v. Vestal*, 137 Ark. 309, 316, 209 S.W. 273, 275 (1919); *Curtis v. Des Jordins*, 55 Ark. 126, 17 S.W. 709 (1891); *Klenk v. Knoble*, 37 Ark. 298 (1881). As the Arkansas Supreme Court noted as early as 1881 in the case of *Klenk v. Knoble*, 37 Ark. 298 (1881), the result of the reasoning is that "one owning a lot in a town might, then, to any reasonable extent, have retained the whole of it as a homestead, if kept for family convenience or pleasure. But he was not required by any policy to retain forever, as part of his homestead, more of it than he might deem reasonably sufficient, and might determine to hold and use the balance as other property." *Klenk*, 37 Ark. at 307.

▇ A party can manifest an intention to abandon a portion of his homestead for business purposes in "any sufficient way." *Klenk v. Knoble*, 37 Ark. at 307. Whether the debtor has abandoned a portion of his homestead by devoting it to business purposes is a factual question and "[a]ny facts or circumstances showing a permanent design, may be considered." *Klenk v. Knoble*, 37 Ark. at 307.

The facts in the instant case are similar to the facts used by the Courts in analyzing in *Klenk* and *Vestal*. In *Klenk*, Mr. Knoble and his family resided on a parcel of land in Fort Smith, Arkansas, consisting of lots 4, 5, and 6. The residence was on part of lot 4 and on lot 5 and Mr. Knoble had built a brewery on part of lot 5 and on lot 6. In *Klenk*, the court focused on the permanency of the business in determining Mr. Knoble's intention:

It is certainly reasonable that the owner of such a homestead, after its character, as such, had been impressed by residence and acts manifesting intention, should be allowed to transact any business upon it he

might deem necessary for the support of his family, to erect conveniences proper for the business, and to, occasionally, rent out such portions of the premises as could be temporarily spared. It would very much neutralize the advantages of a homestead if these things could not be done.... It is certainly true, upon the other hand, and equally reasonable, that any one may, by acts equally indicative of intention, contract the area of his homestead, by cutting off a portion and appropriating it permanently to uses apart from his family conveniences. It is a matter of intention to be derived from the facts.

*Klenk v. Knoble,* 37 Ark. at 303. In determining that Mr. Knoble had abandoned the portion of the property on which the brewery was located the Court stated:

The defendant retained his dwelling house, and a considerable amount of ground with it; seventy-five feet in front, running back one hundred and forty feet, to an alley. What he cut off constituted no part of his actual residence, although occasionally used for family convenience. The brewery-house and cellar had not been built with a view to domestic convenience....

It is to be observed that the Constitution does not limit the *minimum* extent of the lot. The resident may make his homestead as small as he pleases, provided it be not so contracted as to show an intent to evade law, by making it too small for actual use as a homestead.... [T]here is nothing in the policy of the Constitution to prevent the owner from utilizing other portions of his property as a basis of credit— although he might, if so disposed, have held it all against execution. His design so to separate it, may be as fairly inferred from acts and circumstances, as was his original design to invest it with the homestead character.

*Klenk,* 37 Ark. at 305–06.

In *Vestal,* the debtor entered into a partnership arrangement with his son to operate a florist business. Mr. Vestal owned eighty acres of land and, in the partnership agreement, he agreed to rent five acres of his land to the partnership for constructing greenhouses and other improvements. The fee simple title to the property was to remain in Mr. Vestal. In determining that Mr. Vestal had abandoned the five-area tract of land by devoting it to the partnership business, the Court stated:

The contract of partnership was in writing and while [Mr. Vestal] did not convey any interest in the land to his son, he provided for the continuation of the business on the five acres in controversy and the greenhouses, ... were made a part of the partnership effects, and provision was made for their repair, etc. There is nothing in our Constitution or statutes which would prevent [Mr. Vestal] from abandoning a part of his homestead and devoting it to the partnership business and thus subjecting it to the payment of the partnership debts. The business of a florist requires houses peculiar to themselves.... The equipment and fixtures are not fit or appropriate for any other kind of business. The whole of the contract is considered together with the attendant circumstances, it is evident that [Mr. Vestal] intended to segregate the five acres from his homestead and to devote them to the partnership business.

*Vestal,* 137 Ark. at 315–16, 209 S.W. at 275.

Like *Klenk* and *Vestal,* the debtors in this particular case have manifested an intent to devote a portion of their property to business purposes. The debtors did not construct the buildings on their property for any "family" or "domestic convenience" purpose. The buildings were constructed to conduct a manufacturing business by Arkansas Bus. The buildings are permanent in nature and are intended for industrial purposes. The character of the buildings is such that they are only fit or appropriate for commercial or industrial purposes. Mrs. Evans testified at the first meeting of creditors for Arkansas Bus that the debtors' future plans were to either use the buildings to start a new business or to lease the buildings. All of these facts and circumstances considered together are strong evidence that the debtors intended to abandon that portion of the property on which the buildings are situated by devoting that area to the manufacture of new and refurbished buses.

■ The debtors are allowed to reduce the amount of their homestead as long as the amount of property retained for their homestead appears to be reasonable and bona fide. *Klenk*, 37 Ark. at 307. The metal buildings are located on the west end of their property over 300 feet from the residence. The remaining single family dwelling and the ground immediately adjacent thereto appear reasonable and bona fide.

The facts in this particular case can be distinguished from the cases cited by the debtors. For instance, two of the four cases cited by the debtors involved less than one-fourth of an acre of land (*Jordan*, 217 Ark. at 31, 228 S.W.2d at 636; *Berry*, 70 Ark. at 130, 66 S.W. at 439–40) and one case involved less than an acre of land (*King v. Sweatt*, 115 F.Supp. at 217). All four cases involved improvements that were used for the "family" or "dwelling" conveniences. The value of the improvements under consideration in the cases cited by the debtors were not overly significant nor disproportional to the value of the homestead dwelling. *E.g., Berry*, 70 Ark. at 132, 66 S.W. at 440 (stating "[t]his view of the law certainly works no injustice to the creditor where the value of the homestead, including the shop or store used for the business convenience of the owner, is small, as it is here, the whole of the value of $900"). Also, the cases cited by the debtors involve relatively small, "family-type" operations.

By contrast, the property involved in this case involves 2.8 acres and the business was not for family or domestic convenience. The metal buildings located on the debtors' property are worth approximately $200,000.00, which is three times as much at the debtors' residence valued at $64,000.00. The business was operated by a corporation, Arkansas Bus, and is a much more substantial business enterprise than the small businesses involved in the cases cited by the debtors. Because the cases cited by the debtors involved small, family-run operations, there was no injustice done to creditors by allowing the debtors in those cases to claim the whole of the property as a homestead.

Similar to the debtor in *Klenk*, the debtors in this case may still occupy their residence and a considerable amount of property surrounding the residence as a homestead. What the debtors have segregated from their property does not constitute part of their actual residence. The structure of the buildings is such that the character and nature of the buildings constitute evidence of the debtors' intention to permanently devote this property to business purposes.

Therefore, for the foregoing reasons, that portion of the debtors' property constituting the business property is determined to have been permanently segregated by the debtors and is no longer a portion of the debtors' homestead.

### B. *Rural or Urban Homestead*

■ Even if the debtors had not segregated a portion of their homestead by devoting it to industrial business purposes, they cannot exempt the portion of the property containing the buildings as their homestead because the debtors' homestead is urban in nature and is limited to one-fourth an acre. The Arkansas Constitution describes a rural homestead as:

> [t]he homestead outside any city, town or village, owned and occupied as a residence, shall consist of not exceeding one hundred and sixty acres of land with the improvements thereon, to be selected by the owner, provided the same shall not exceed in value the sum of twenty-five hundred dollars, and in no event shall the homestead be reduced to less than eighty acres, without regard to value.

Ark. Const. art. 9, § 4. The Arkansas Constitution describes an urban homestead as:

> [t]he homestead in any city, town or village, owned and occupied as a residence, shall consist of not exceeding one acre of land, with the improvements thereon, to be selected by the owner, provided the same shall not exceed in value the sum of two thousand five hundred dollars, and in no event shall such homestead be reduced to less than one-quarter of an acre of land, without regard to value.

Ark. Const. art. 9, § 5.

 The question of whether a homestead claimed as exempt constitutes a rural or urban homestead must be determined based on the facts of each case and must be considered in light of the constitutional intent of the exemptions allowed. *King v. Sweatt,* 115 F.Supp. 215, 220 (W.D.Ark.1953); *Farmers Coop. Ass'n v. Stevens,* 260 Ark. 735, 736–37, 543 S.W.2d 920, 921 (1976). The rural/urban issue is not "altogether controlled by the corporate limits," thus property located outside the corporate limits may be determined urban. *First Nat'l Bank v. Wilson,* 62 Ark. 140, 143, 34 S.W. 544, 544 (1896). *See King v. Sweatt,* 115 F.Supp. at 219–20; *Farmers Coop. Ass'n v. Stevens,* 260 Ark. at 738–39, 543 S.W.2d at 922–23. The court stated in *First Nat'l Bank v. Wilson,* 62 Ark. 140, 34 S.W. 544 (1896):

> [T]here may be towns that have overgrown their corporate limits, so that one may dwell within the town, and still be outside the corporate limits. In such cases it may be that the courts would look to the facts to determine whether the homestead claimed was located in town or country, and not be altogether controlled by the corporate limits.

*First Nat'l Bank v. Wilson,* 62 Ark. at 143, 34 S.W. at 544.

 The parties objecting to the debtors' claim of exemption assert that the debtors' use of the property for business purposes makes the property urban rather than rural. The use made of the property is "very much pertinent" to the determination of the rural or urban character of a debtor's homestead. *Farmers Coop. Ass'n v. Stevens,* 260 Ark. at 738, 543 S.W.2d at 921. Use of the property for exclusively agricultural purposes generally indicates a rural homestead; however, property used for other purposes may still be determined rural. *Smith v. Webb (In re Webb),* 121 B.R. 827, 830 (Bankr. E.D.Ark.1990); *Bank of Sun Prairie v. Hovig,* 218 F.Supp. 769, 783–84 (W.D.Ark.1963); *King v. Sweatt,* 115 F.Supp. at 218–19; *George v. George,* 267 Ark. 823, 826, 591 S.W.2d 655, 657 (Ct.App.1979). *But see First Nat'l Bank v. Wilson,* 62 Ark. 140, 143, 34 S.W. 544, 544 (1896) (holding that residence on nine-acre tract of land used for agricultural purposes should be limited to urban homestead because it was within the town of Brinkley).

Courts have focused on the characteristics of the property and surrounding area in determining whether the homestead should be considered rural or urban. The Constitution describes a rural homestead as a "homestead outside any city, town or village, owned and occupied as a residence." Ark. Const. art. 9, § 4. No precise legal definition is provided for the terms "city, town or village," as used in the Arkansas Constitution to describe the homestead exemption. In cases concerning the definition of these terms, the Arkansas Supreme Court has determined that the "words were used in the Constitution in their popular sense." *King v. Sweatt,* 115 F.Supp. at 220. *See Farmers Coop. Ass'n v. Stevens,* 260 Ark. at 738–39, 543 S.W.2d at 921. In one case the term "village" was described as a small urban community or town. *King v. Sweatt,* 115 F.Supp. at 221. In *Bank of Sun Prairie v. Hovig,* 218 F.Supp. 769 (W.D.Ark. 1963) the court stated that "[a] city is a town and a village is a town, and ordinarily the word city or village indicates the size of the town. Therefore, the word town seems to be the key word in the Constitutional provisions under consideration." *Bank of Sun Prairie,* 218 F.Supp. at 784. The Arkansas Supreme Court discussed the popular meaning of the word "town" in the case of *Rogers v. Galloway Female College,* 64 Ark. 627, 635, 44 S.W. 454 (1898) where it stated:

> Generally, in speaking of a town as a mere place of geographical location, we have no reference whatever to the corporate limits, but simply use the name of the town as designating the aggregate body of people living in such considerable collection of dwelling houses and in such proximity as to constitute a town, as distinguished from the country.

*Rogers v. Galloway Female College,* 64 Ark. 627, 635, 44 S.W. 454, 456 (1898). The Arkansas Supreme Court also discussed the popular sense of the word "town" in *Southeast Ark. Levee Dist. v. Turner,* 184 Ark. 1147, 1151, 45 S.W.2d 512, 514 (1932). In

that case the issue was whether certain property was situated in the town of McGehee, Arkansas. The residences were all of a permanent and substantial character and the residents were engaged in "pursuits related to and carried on in the city of McGehee." *Southeast Ark. Levee Dist. v. Turner,* 184 Ark. at 1150, 45 S.W.2d at 513. In addition, the occupants were furnished with gas, water, electric, and telephone services from the city of McGehee. In holding that the area was within the city of McGehee, although not within the actual corporate limits of McGehee, the Court stated:

> We have here a compact community of 42 houses, occupied by persons who may fairly be said to dwell together, and who are separated from a city of the second class only by the city's incorporation line, and who have all the conveniences which proximity to the city affords, and whose property is assessed for general taxation as additions to this city.
>
> ....
>
> ... The city of McGehee has grown in various directions, and is now, and was at the time the assessments in question were made, a larger town than its corporate limits indicate. In other words, many persons are residents of the town of McGehee within the popular meaning of the word "town" who do not reside within the corporate limits thereof.

*Southeast Ark. Levee Dist. v. Turner,* 184 Ark. at 1153, 45 S.W.2d at 514.

▆ Although the law creating the homestead should be liberally construed, the "[c]onstruction should not be so liberal as to depart from the plain and obvious meaning of the words used in the Constitution or to confer rights upon persons who have not brought themselves at least with the spirit of the Constitutional provisions." *King v. Sweatt,* 115 F.Supp. 215, 218 (W.D.Ark.1953).

▆ Property will be determined to be urban, if it is in a community that contains the common attributes and conveniences of a city. *See Bank of Sun Prairie v. Hovig,* 218 F.Supp. at 785; *King v. Sweatt,* 115 F.Supp. at 221; *Farmers Coop. Ass'n v. Stevens,* 260 Ark. at 739, 543 S.W.2d at 923. Numerous factors are considered in making this determination. The courts in the following cases found a rural homestead: *Bank of Sun Prairie v. Hovig,* 218 F.Supp. at 785 (finding rural homestead where property is located less than three miles from Hot Springs city limits in an unincorporated community with no local fire protection, public schools, sewer systems, public waterworks, street lights, or public sidewalks and where the cost of paving the road was partly borne by the landowners); *King v. Sweatt,* 115 F.Supp. at 215 (finding rural homestead where property is located one mile from Hot Springs corporate limits situated in an unincorporated community with no post office, school, church, or other improvements except filling stations, tourist courts, and one or two "country stores"); *Farmers Cooperative Ass'n v. Stevens,* 260 Ark. at 739, 543 S.W.2d at 923 (finding rural homestead where property is used for agricultural purposes and is situated in incorporated community with two churches, no schools, no service stations, no industry, and no motels).

In this case, the facts support a finding that the debtors' homestead is urban in nature. The debtors' property on Grider Field Ladd Road, although not technically within the city limits of Pine Bluff, is only six to eight feet away. The debtors' property enjoys all the modern conveniences that are enjoyed by the residents of the city of Pine Bluff. For example, electricity and phone services are provided by the same suppliers that service Pine Bluff residents. Emergency services, including fire, police, and ambulance services, are provided to the property through the 911 Emergency Service System in Pine Bluff, Arkansas. In addition, although the debtors use the services of a Ladd Water Association, city water is available at the road adjoining the property. Retail services such as gas stations and a grocery store are available approximately one mile from the homestead.

The bus manufacturing business located on the debtors' property is consistent with other uses of the property in close proximity to the debtors' residence. The surrounding area

contains many commercial and industrial businesses, which is not characteristic of a rural area, but more characteristic of an urban area.

For the foregoing reasons, the Court finds that the debtors' homestead is urban in nature and is, therefore, limited to one-fourth an acre.

IT IS SO ORDERED.